1

1          IN THE UNITED STATES BANKRUPTCY COURT
2            FOR THE SOUTHERN DISTRICT OF GEORGIA
                     SAVANNAH DIVISION

3

4   IN RE:                        :
                                  :   Chapter 7
5   RODNEY ALLEN GIBSON and       :
    DEBORA MINERVA GIBSON,        :
6                                 :   Case No. 21-40749-EJC
        Debtors.                  :
7   _____    United States Courthouse Annex
                                      124 Barnard Street
8                                     Savannah, Georgia

9

10

11

12

13                    TRANSCRIPT OF HEARING

14     BEFORE THE HONORABLE EDWARD J. COLEMAN, III
15        CHIEF UNITED STATES BANKRUPTCY JUDGE

16                    April 11, 2023

17

18

19

20

21
    *Transcript ordered by the Honorable Edward J. Coleman, III
22  _____

23  TRANSCRIBED BY:  Victoria L. Root, CCR
                     United States Court Reporter
24                   Post Office Box 312
                     Meldrim, Georgia  31318
25                   (912) 650-4066

2

1                         A P P E A R A N C E S

2


3    FOR DEBTORS:

4              STEPHANIE K. SHEPPARD, Esquire
               Sheppard Legal Services, LLC
5              2727 Paces Ferry Road, S.E.
               Building One, Suite 750
6              Atlanta, Georgia  30339
               (404) 503-9188
7              sheppardlegalservices@gmail.com

8


9    FOR THE OFFICE OF THE UNITED STATES TRUSTEE:

10             JOEL PASCHKE, Esquire
               United States Trustee's Office
11             33 Bull Street, Suite 400
               Savannah, Georgia  31401
12             (912) 652-4116

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                        I N D E X

2                                                    Page

3   PRELIMINARIES. . . . . . . . . . . . . . . . . .    5

4

    OPENING STATEMENTS
5       By Mr. Paschke . . . . . . . . . . . . . . .    5
        By Ms. Sheppard. . . . . . . . . . . . . . .    8
6

7   WITNESSES:

8       1. DEBORA MINERVA GIBSON
           Direct Examination by Mr. Paschke . . . . .    9
9           Examination by the Court. . . . . . . . . .   37
           Cross-Examination by Ms. Sheppard . . . . .   40
10          Further Examination by the Court. . . . . .   42
           Redirect Examination by Mr. Paschke . . . . .   44
11

12      2. STEPHANIE SHEPPARD
           Direct Examination by Mr. Paschke . . . . .   46
           Examination by the Court. . . . . . . . . .   62
13

14  CLOSING ARGUMENTS
        By Mr. Paschke . . . . . . . . . . . . . . .   70
15      By Ms. Sheppard. . . . . . . . . . . . . . .   77
        By Mr. Paschke . . . . . . . . . . . . . . .   80
16

17  CERTIFICATE OF REPORTER. . . . . . . . . . . . .   89

18

19

20

21

22

23

24

25

4

E X H I B I T   I N D E X

| EXHIBIT NUMBER | IDENTIFIED | TENDERED | ADMITTED |
|---|---|---|---|
| 1 | 47 | 8 | 8 |
| 2 | 11 | 8 | 8 |
| 3 | 17 | 8 | 8 |
| 6 | 25 | 26 | 27 |
| 7 | 21 | 22 | 23 |
| 8 | 28 | 8 | 8 |

5

1          P R O C E E D I N G S

2      (Call to order at 12:29 p.m.)

3          THE COURT:  All right.  The Court will call the

4  case of *Rodney Allen Gibson and Debora Minerva Gibson*, Case

5  Number 21-40749.

6          Appearances?

7          MR. PASCHKE:  Thank you, Your Honor.  Joel Paschke

8  for the United States Trustee.

9          MS. SHEPPARD:  Stephanie Sheppard, attorney for the

10  debtors.

11          THE COURT:  Good morning -- or good afternoon,

12  Ms. Sheppard.

13          MS. SHEPPARD:  Good afternoon.

14          THE COURT:  Pleasure to meet you.

15          MS. SHEPPARD:  It's a pleasure.

16          THE COURT:  All right.  We have on the calendar,

17  Mr. Paschke, your motion for sanctions.

18          Do you want to outline that for me and tell me where

19  we stand?

20          MR. PASCHKE:  Yes, Your Honor.

21          The U.S. Trustee brought this motion because it was

22  concerned about a particular business model that seems to be

23  cropping up in consumer cases across -- around the country in

24  various jurisdictions.  And this happens to be another example.

25          And the example that I'm referring to, Your Honor, is

1    where a nationwide -- or a purported nationwide bankruptcy firm

2    advertises over the Internet to collect clients from various

3    jurisdictions around the country; does bankruptcy work

4    in-house, basically preparing petitions, schedules, statements

5    of financial affairs, and related pleadings; then ships those

6    documents out to a local counsel who's licensed to practice

7    in the jurisdiction where the debtor actually resides.  And

8    then that attorney uses their ECF filing privileges to file the

9    case, represent the debtor at the 341 meeting, and so forth.

10            This business model, we think, gives rise to various

11   concerns under the rules regarding disclosure that relieve

12   agencies -- 707(b)(4) -- with regard to who's conducting the

13   intensive fact-gathering process as well as fee sharing and

14   other issues that have been raised by other courts.  And I

15   think we cited a case in our motion.

16            Prior to today's hearing, I have been in contact

17   with Ms. Stephanie Sheppard, who is here today.  She is local

18   counsel for the debtors in this case.  Recovery Law Group has

19   not contacted me, and I have -- I believe there has been no

20   response filed by Recovery Law Group as of this morning anyway.

21            So we're at the point now, Your Honor, where the

22   debtors are here.  Debora and Rodney Gibson are in the

23   courtroom and ready to testify about how their case came about.

24   Ms. Sheppard is also here and is willing to give the Court her

25   statement and offer some testimony as to her involvement in the

7

1    case --

2            THE COURT:  Okay.

3            MR. PASCHKE:  -- and anything she might be able to

4    tell us about Recovery Law Group.

5            In addition, I have several exhibits that have been

6    marked.  And I wonder if it might be beneficial at this point

7    to make sure that the Court has copies of them.  I don't know

8    if we will be using that as the witness area.  Maybe we can put

9    copies there as well.

10           THE COURT:  All right.  Well, why don't we just --

11   Ms. Sheppard, do you have any objection to the Court reviewing

12   the proposed exhibits?

13           MS. SHEPPARD:  (No response.)

14           THE COURT:  Have you been provided with copies?

15           MS. SHEPPARD:  Yes, Your Honor, I do have copies of

16   all of the exhibits.

17           I have no objection to Exhibit 1, Exhibit 2,

18   Exhibit 3, or Exhibit 8.

19           I do have objection to Exhibits 4, 5, 6, and 7.

20   Those exhibits are purported to be emails that were originated

21   from Recovery.  I can neither confirm nor deny the authenticity

22   of those emails.  So at this juncture, as far as the case

23   relates to me, I am opposed to those exhibits.

24           THE COURT:  Okay.  Thank you.

25           MS. SHEPPARD:  You're welcome.

1        MR. PASCHKE:  Your Honor, just so we don't forget, I

2   would ask that the Court admit Exhibits 1, 2, 3, and 8 into the

3   evidentiary record at this time.

4        THE COURT:  No objection?

5        MS. SHEPPARD:  No objection, Your Honor.

6        THE COURT:  All right.  They are admitted.

7        And these are marked UST exhibits?

8        MR. PASCHKE:  No.  They are just Exhibits 1, 2, 3,

9   and 8.

10        THE COURT:  That's fine.

11     (An off-the-record discussion was held.)

12        MR. PASCHKE:  Thank you, Your Honor.  I think we're

13   ready to start taking testimony at this point.

14        THE COURT:  Okay.

15        MR. PASCHKE:  And the U.S. Trustee would like to call

16   Debora Gibson to the stand.

17        THE COURT:  Well, let me interrupt.  Your remarks

18   were very abbreviated, and that's fine.

19        Ms. --

20        MR. PASCHKE:  Oh, I apologize, Your Honor.

21        THE COURT:  Is it Sheppard?

22        MS. SHEPPARD:  Mine will probably be shorter than

23   what his were.

24        Good afternoon.  Thank you, Your Honor.  As

25   Mr. Paschke has outlined, we are here on the trustee's motion

9

1    for sanctions where myself and Recovery Law Group, known as RLG

2    throughout this proceeding . . .

3          And while I can understand that the trustee doesn't

4    particularly care for RLG's business model, it is my belief

5    that the testimony that the Court will hear today will show

6    that, one, the debtors knew who they were hiring and what

7    they were paying; two, that Attorney Sheppard -- that would

8    be myself -- satisfactorily performed the duties that were

9    outlined in the retainer agreement; and, three, that the

10   debtors' case was successfully discharged.

11         If the Court has any questions in regards to Recovery

12   Law Group, to the extent that I'm aware of, I'm more than

13   willing to provide that information.  Mr. Paschke can tell you

14   that we have been in communication.  I am very transparent and

15   very forthcoming.  So if there's anything that you need from me

16   that I have, you have it.  Thank you.

17         THE COURT:  Okay.  Thank you, ma'am.

18         Mr. Paschke, you may call your first witness.

19         MR. PASCHKE:  Thank you, Your Honor.  The

20   U.S. Trustee calls Debora Gibson.

21                      DEBORA GIBSON,

22   having been duly sworn, was examined and testified as follows:

23                    DIRECT EXAMINATION

24   BY MR. PASCHKE:

25   Q.   Thank you for being here today, Ms. Gibson.

10

1    A.    Yes, sir.

2    Q.    My understanding is that you and your husband are

3    Chapter -- were Chapter 7 debtors in Case Number 21-40749; is

4    that --

5    A.    Yes, sir.

6    Q.    -- correct?

7          And my understanding is that -- sorry.  There was a little

8    bit of feedback there.

9          And did you engage the services of Recovery Law Group to

10   help you with your bankruptcy case?

11   A.    Yes, sir.

12   Q.    How did you find Recovery Law Group?

13   A.    Basic Internet search looking for bankruptcy attorneys.

14   Q.    And how did you make first contact with Recovery Law

15   Group?

16   A.    A online contact, basically a questionnaire.

17   Q.    Okay.  So you filled out an online questionnaire and

18   submitted it?

19   A.    Yes, sir.

20   Q.    And how did they get back to you after that?

21   A.    Email inquiry.

22   Q.    Okay.  And do you recall who that email was from?

23   A.    It was not the lady that I dealt with all the time.  It

24   was -- a general kind -- intake-type person got our basic

25   information and said that they would have somebody reach out to

1  us and be in contact with us.

2  Q.   Okay.  And was that by email then?

3  A.   Yes, sir.

4  Q.   Did you sign a Chapter 7 retainer agreement with Recovery

5  Law Group?

6  A.   Yes, sir.

7  Q.   And I think that's been marked as Exhibit 2 in front of

8  you.

9       If you take a look at Exhibit 2, can you confirm for me

10 that this is the retainer agreement that you signed with

11 Recovery Law Group?

12 A.   Yes, sir.

13 Q.   And you'll see that there are page numbers marked at the

14 very top of each page in the right-hand corner.

15 A.   Yes, sir.

16 Q.   Page 1 of 12, for example, is the first page.

17 A.   Uh-huh.

18 Q.   If you go to Page 3 of 12, you'll see the signature block.

19 A.   Yes, sir.

20 Q.   Down at the bottom of Page 3 of 12, you'll see what

21 appears to be an electronic signature of your -- your name,

22 Debora Gibson.

23      Do you see what I'm referring to?

24 A.   Yes, sir.

25 Q.   And is that your electronic signature?

1    A.   Yes, sir.

2    Q.   And did you put that electronic signature on this

3    agreement?

4    A.   Yes, sir.

5    Q.   Okay.  And beneath your name, there is another name.  It

6    says --

7              THE COURT:  Let me stop you there.

8              How does that work?  How does the electronic

9    signature work?

10             THE WITNESS:  It's a box that you type your name in,

11   and it automatically transfers it to a signature.  You type

12   your actual name, and it creates a signature of it.

13             THE COURT:  Is that a program, or is it just related

14   to this document?

15             THE WITNESS:  It's a program on that document that

16   you have on your computer.

17             THE COURT:  Okay.  Have you done that in other --

18             THE WITNESS:  Yes, sir.

19             THE COURT:  -- contexts?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Okay.  Thank you.

22   BY MR. PASCHKE:

23   Q.   And you'll note that the date of this agreement next to

24   your name is June 30th of 2021; correct?

25   A.   Correct.

13

1   Q.   Is that the -- is that the date that you signed this

2   document electronically?

3   A.   To my recollection, yes.

4   Q.   And underneath your signature, you'll find the name

5   Nicholas.

6       Do you know who that is?

7   A.   That was also one of the intake people that we dealt with

8   back and forth through email.

9   Q.   Do you know his last name?

10   A.   I do not.

11   Q.   Do you know if he's an attorney?

12   A.   I do not.

13   Q.   Okay.  All right.  Let's continue on.

14       Did Recovery Law Group provide you a hard -- or paper copy

15   of the Chapter 7 retainer agreement for your own records?

16   A.   As in looking last night again through all of my emails,

17   I do not remember getting one from them.

18   Q.   Okay.  But we got this --

19          THE COURT:  Are you asking her if she ever got a copy

20   of Exhibit 2?

21          MR. PASCHKE:  Yes.

22          THE COURT:  Well, I mean, she signed it, so . . .

23          THE WITNESS:  But it was --

24          MR. PASCHKE:  She --

25          THE WITNESS:  -- an electronic --

14

1          MR. PASCHKE:  She signed it.  It was an electronic --
2     it was an electronic document on their system.
3          THE COURT:  So are you asking her if they ever mailed
4     her a paper copy?
5          MR. PASCHKE:  Yes.
6          THE COURT:  Okay.
7          THE WITNESS:  No, sir.
8          THE COURT:  And they didn't mail you a paper copy?
9          THE WITNESS:  No, sir.
10          THE COURT:  Okay.
11    BY MR. PASCHKE:
12    Q.   Did you have an electronic version of this document saved
13    somewhere on your computer?
14    A.   No, sir.
15    Q.   Okay.
16          THE COURT:  Well, do you -- but you could go back to
17    the email and click on --
18          THE WITNESS:  No, sir.  It's an actual -- it's like a
19    DocuSign agreement is what they send over.
20          THE COURT:  So once you sign it, it --
21          THE WITNESS:  It goes directly to them.
22          THE COURT:  And you don't have it on your computer
23    anymore?
24          THE WITNESS:  No, sir.  It goes to them.  It's in our
25    file to the -- to the -- RLG.  It's part of our file.

15

1          THE COURT:  But you can't retrieve it on your --

2          THE WITNESS:  No, sir.

3          THE COURT:  -- own computer?  Okay.

4          THE WITNESS:  No, sir.

5          THE COURT:  Thank you, Mr. Paschke.

6          MR. PASCHKE:  Okay.

7   BY MR. PASCHKE:

8   Q.   Okay.  So you've signed an -- you signed a retention

9   agreement with Recovery Law Group?

10  A.   Uh-huh.

11  Q.   Did your husband also sign that agreement?

12  A.   Yes, sir.

13  Q.   But we don't see his name anywhere on this document --

14  A.   Right.

15  Q.   -- or, I should say, the Chapter 7 retainer agreement; is

16  that correct?

17  A.   Correct.

18  Q.   Do you know why that is?

19  A.   No, because we actually signed it the same night together.

20  We were sitting -- I remember.  We were sitting at our kitchen

21  table.  We signed it.  It was on my laptop.

22  Q.   Okay.  Now, did you pay RLG for their services?

23  A.   Yes, sir.

24  Q.   And do you recall how much you paid?

25  A.   It was roughly -- I saw a number in there, but I know it

1    was around 1,800.

2    Q.   Right.  Approximately $1,838?

3    A.   Yes, sir.

4    Q.   And how did you make that payment?

5    A.   We broke it up into small payments.  We had a portal that

6    we could go into and make payments.  It was supposed to have

7    been broke down into, say, I think, 6 or 12 months.  But every

8    time I'd get a little extra, if I had it, I'd go in and pay it,

9    so -- and then we ended up paying it off early.

10   Q.   Okay.  So you made payments over time --

11   A.   Yes, sir.

12   Q.   -- to pay that amount?

13   A.   Yes.

14   Q.   And you -- how did you make those payments?

15   A.   It was --

16   Q.   You said through an online portal?

17   A.   Yes, sir.

18   Q.   And did you have to use a debit card or a bank account?

19   A.   It was our debit card.

20   Q.   Okay.

21        THE COURT:  Do we know -- do you know the dates and

22   amounts of each payment?

23        THE WITNESS:  There was a record of it somewhere in

24   our -- in our file.  There was.  I don't have it in front of

25   me, but there was a file.  Ms. Sheppard may have had it in our

1   packet.  I'm not sure.  But there was, like, a receipt trail

2   that had it.

3   BY MR. PASCHKE:

4   Q.   And also in Exhibit 3, it'll show us what was paid as

5   well --

6   A.   Okay.

7   Q.   -- when we get there.

8   A.   Okay.  Sorry.

9   Q.   Now, while you were making payments, was there any

10  activity going on in terms of collecting information from you

11  for --

12  A.   Yes, sir.

13  Q.   -- preparing petitions, schedules, and --

14  A.   Yes, sir.

15  Q.   -- statement of financial affairs?

16  A.   We would get an email asking for pay stubs or -- my

17  husband's on workers' comp.  They couldn't really use that, but

18  I'd make sure we sent it anyway.  They were asking for a

19  driver's license, tax returns.  So every time we got that, we'd

20  also get another email back stating that upload was successful

21  or -- we were uploading things, so (indiscernible) to them.

22  Q.   Okay.  So, in other words, you were providing documents

23  electronically by --

24  A.   Yes.

25  Q.   -- uploading them through their proprietary system?

18

1  A.   Yes, sir.

2  Q.   Okay.  Who was the intake person at Recovery Law Group

3  that worked with you?

4  A.   I knew her as Patty.

5  Q.   Okay.  Do you know a last name?

6  A.   I did at the time, but I can't remember, like, because we

7  would communicate through emails and telephone.

8  Q.   Okay.

9  A.   But I can't remember her name off the top of my head.

10  Q.   Does the name Patricia Mulcahy (phonetic) ring a --

11  A.   Yes --

12  Q.   -- bell?

13  A.   -- because he even remembered that, too.

14  Q.   Okay.

15  A.   Yes.

16  Q.   Is that the person that you're --

17  A.   Yes, sir.

18  Q.   -- you're referring to as Patty?

19  A.   Yes.

20  Q.   Okay.  How did you communicate with Patty?

21  A.   Through email and telephone.

22  Q.   During the intake process when you were uploading

23  information to Recovery Law Group's system, did Patty or

24  someone else at Recovery Law Group other than Ms. Sheppard,

25  who's here today, advise you regarding the difference between

1   secured and unsecured debts?

2   A.   Yes, sir.

3   Q.   Did they advise you regarding the difference between

4   Chapter 7 and Chapter 13?

5   A.   Yes, sir.

6   Q.   Did they make a recommendation to you regarding filing

7   Chapter 7 rather than Chapter 13?

8   A.   Yes, sir.

9   Q.   And did they explain to you what exemptions were available

10  to you under Georgia law?

11  A.   Yes, sir.

12  Q.   Okay.  We made a brief reference to Exhibit 3, so why

13  don't we open up Exhibit 3 to Statement of Financial Affairs,

14  Question 16.  And I'll tell you the page number.  It's on

15  Page 51 of 67 if you follow the page numbers in the top

16  right-hand corner.

17  A.   Okay.

18  Q.   And we'll just take a moment to confirm that the amount

19  that you ultimately paid Recovery Law Group was $1,838

20  according to this response to Question 16.

21  A.   Yes, sir.

22  Q.   Is that correct?

23  A.   Yes, sir.

24  Q.   Okay.  Now, after --

25          THE COURT:  Mr. Paschke --

20

1          MR. PASCHKE:  Yes.

2          THE COURT:  -- did you say that Exhibit 3 was going

3    to show the date and the amount of all the payments?

4          MR. PASCHKE:  No, not the date and amount but just

5    the ultimate amount -- the ultimate sum that was paid to

6    Recovery Law Group.

7          THE COURT:  Okay.  Thank you.

8          But it looks like the last payment was September 2nd,

9    2021?

10         MR. PASCHKE:  I think that's the date -- yes.  I

11   think that's the date that it was finally paid off in full.

12         THE COURT:  Okay.

13         Do you agree with that?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Okay.  Thank you.

16         Go ahead.

17         MR. PASCHKE:  Okay.

18   BY MR. PASCHKE:

19   Q.   Okay.  Now, after you paid off the attorney's fees and

20   the court filing fee in full in early September, what happened

21   then?  Did you receive some more emails from Recovery Law

22   Group?

23   A.   I remember emailing them stating that I had just

24   finished paying it off.  And I got an email from an attorney,

25   Michael Reid, that he was going to be, you know, getting in

1  touch with us.  He went over everything through email --

2  everything was always through email -- and made sure -- he said

3  that everything was in order and that an attorney would be in

4  touch with us shortly to go ahead and finalize everything.

5  Q.   Okay.  Okay.  I am going to show you what's been marked as

6  Exhibit 7.

7          MR. PASCHKE:  Do you have a copy, Ms. Sheppard?

8          MS. SHEPPARD:  Uh-huh.

9          MR. PASCHKE:  Okay.

10 BY MR. PASCHKE:

11 Q.   Is this the September 6th email that you were just

12 referring to from Michael Reid?

13 A.   Yes.

14 Q.   Could you please read it for me.

15 A.   Yeah.  It says "Hi, Rodney and Debora.  Now that you are

16 paid in full, we will need you to address a few items, and then

17 we will be ready to file your case.  Please provide us the

18 documents described in Email 2, sign and mail us the documents

19 sent to you in Email 3, and complete the credit counseling

20 course.

21     "After you've addressed these emails, please call us to

22 verify our receipt of required items and make sure you do

23 not -- and make sure we do not need anything further.  After we

24 verify our receipt of the required items with you, we can get

25 your case prepared for filing.  We will complete a prefiling

22

1    review with you over the phone, and then we can get your

2    bankruptcy paperwork finalized and filed.

3         "Thank you, Michael -- Michael Reid."

4    Q.   Is this a fair and accurate representation or a copy of

5    the email that you received from Michael Reid on September 6th?

6    A.   Yes, sir.

7              MR. PASCHKE:  I would offer this exhibit into

8    evidence.

9              THE COURT:  All right.  First of all, Ms. Gibson --

10             THE WITNESS:  Yes, sir.

11             THE COURT:  -- did you print this off of your

12   computer?

13             THE WITNESS:  I had provided, if I remember

14   correctly, these to Mr. Paschke, and -- but I have this copy

15   in my computer, yes, sir.  I do have these emails saved.

16             THE COURT:  Oh, okay.  I -- just chain of custody,

17   you forwarded this to Mr. Paschke?

18             THE WITNESS:  Yes --

19             THE COURT:  Okay.  All right.

20             THE WITNESS:  -- if I remember correctly.  It's been

21   a while.

22             MR. PASCHKE:  That's correct, Your Honor.

23             THE COURT:  All right.  Counsel, you -- did you have

24   an objection, Counsel?

25             MS. SHEPPARD:  I do.  And I understand that

23

1  Ms. Gibson is saying that this was -- this is a true and

2  correct copy of what was received, but without being able to

3  authenticate the sender, I -- that's my only issue with it.

4          THE COURT:  All right.  Well, the Court is going to

5  admit the exhibit --

6          MS. SHEPPARD:  That's fine.

7          THE COURT:  -- as a document that came to Mrs. Gibson

8  through her computer.  And I'll -- I'll let the weight of it --

9  since none of us truly know where it came from, I'll let the

10  weight of it be determined later.

11          MR. PASCHKE:  Okay.

12  BY MR. PASCHKE:

13  Q.  And let's just -- just to follow up on that, if you're

14  still holding Exhibit 7, could you note for the record,

15  Ms. Gibson, what is the -- what appears beneath Michael Reid,

16  Esquire, down at the bottom of that email?

17  A.  "Recovery Law Group," the office number, his direct line,

18  fax number, email, website, "Are debt collectors harassing

19  you?" basically a statement that, if so, you may be entitled to

20  money.

21  Q.  Thank you.  I think that's good enough.

22  A.  Okay.

23          THE COURT:  But I've admitted it for -- that over

24  Counsel's objection.

25          MR. PASCHKE:  Thank you, Your Honor.

24

1    BY MR. PASCHKE:

2    Q.   Okay.  So after you received this email from Michael Reid,

3    did you then comply with the email --

4    A.   Yes, sir.

5    Q.   -- and submit documentation to Recovery Law Group?

6    A.   Yes, sir.

7    Q.   Okay.

8              THE COURT:  You have a scanner at home?

9              THE WITNESS:  No, sir.  I would actually take things

10   to work with me that I needed to have scanned in, and I would

11   scan them in at work.

12             THE COURT:  And then --

13             THE WITNESS:  Attach it to the email, because I had

14   access to our email -- my email -- my personal email at work.

15   So I would attach it and send it that way.

16             THE COURT:  Gotcha.  Thank you.

17             THE WITNESS:  You're welcome.

18             MR. PASCHKE:  Your Honor, the next exhibit I'd like

19   to tender to the witness is Exhibit 6.

20             Do you have a copy of Exhibit 6?

21             MS. SHEPPARD:  Uh-huh.

22             THE COURT:  For the record, I guess my clerk has

23   attached as -- exhibit labels UST 1, UST 2, et cetera.

24             MR. PASCHKE:  Okay.

25             THE COURT:  I think I asked you before what it said,

25

1   and you said they were just numbers, but she added the "UST."

2            MR. PASCHKE:  Okay.  That's fine.

3            THE COURT:  All right.  Thank you.

4            MR. PASCHKE:  When I marked them prior to the --

5   prior to coming here today, I just put Exhibits 1 through 8

6   and --

7            THE COURT:  Fair enough.

8            MR. PASCHKE:  If they say "UST," that's fine.

9   BY MR. PASCHKE:

10  Q.   Exhibit 6 is now in front of you, Ms. Gibson.

11       Can you identify what this is?

12  A.   Yes, sir.  This is part of the email string that came from

13  Michael Reid requesting for us to go over this information

14  and anything else that was needed for our packet to file our

15  bankruptcy.

16  Q.   So this is one of the emails that came to you in early

17  September after you had paid the attorney's --

18  A.   Uh-huh.

19  Q.   -- fees and the court filing fee; correct?

20  A.   Yes, sir.

21  Q.   Can you read what it says in the very first block of text

22  containing Numbers 1, 2, and 3.

23  A.   Yes, sir.  It says "The email contains these attachments."

24  Number 1, "The first attachment to this email is an existing

25  draft of your bankruptcy paperwork.  You do not need to sign

26

these papers -- or pages.  Please read through them and see the explanation below regarding this paperwork."

Number 2, "The second attachment contains a list of creditors listed in your paperwork.  These creditors were pulled from our software and are creditors that are indicated on your credit reports from the three credit bureaus.  If you owe money to any additional creditors or collectors that are not indicated on this attachment, please send us a complete list with their names, addresses, and the amounts owed."

Number 3 says "The third attachment contains all the signature pages of your bankruptcy paperwork that you will need to sign and return to us.  Please sign but do not date these documents.  These must be mailed to us at Recovery Law Group, 309 West 11th Street, Anderson, Indiana 46016."

Q.   Thank you, Ms. Gibson.

Is this part of the email -- is this one of the emails that you provided to our office at our request?

A.   Yes, sir.

Q.   And is this, what you're holding in front of you as Exhibit 6 today, a true and accurate copy of the email that was sent to you by Michael Reid on September 2, 2021?

A.   Yes, sir.

MR. PASCHKE:   I would ask that this be admitted into evidence as well, Your Honor.

THE COURT:   Any objection?

27

1          MS. SHEPPARD:  I just have the same objection as I

2     did with the previous one because, as Counsel said, this was

3     sent by Michael Reid, but we have no way to authenticate that.

4     So that's my only objection.

5          THE COURT:  All right.  Your objection is duly noted,

6     and I will admit Exhibit 6 over your objection.  But, for the

7     record, I will again acknowledge that we're not sure where this

8     document came from, but it's admitted.

9     BY MR. PASCHKE:

10    Q.   But, again, at the top of this, you can see the email

11    address that is --

12    A.   Yes, sir.

13    Q.   -- indicated by the sender; correct?

14    A.   Yes, sir.

15    Q.   And whose email address does it appear to be?

16    A.   Michael@recoverylaw.com.

17    Q.   Thank you.

18         Now, after you received these emails in early September,

19    did you then cooperate with Michael and upload additional

20    information --

21    A.   We actually --

22    Q.   -- through the system?

23    A.   I went through and printed everything as far as --

24    everything that was required -- tax documents, copies of pay

25    stubs, W-2s, everything that they had asked for in the

28

1    portal -- and had Mr. Gibson go ahead and mail it off to that

2    address.

3    Q.   Okay.  So you --

4    A.   So they did have paper copies also.

5    Q.   Okay.  So you did it both ways?

6    A.   Yes, sir.

7    Q.   And when you say "Mr. Gibson," you're referring to your

8    husband --

9    A.   Yes, sir.

10   Q.   -- correct?  Okay.

11        So all the information was provided directly to Recovery

12   Law Group at this address that's --

13   A.   In the --

14   Q.   -- noted in the email that we --

15   A.   Yes, sir.

16   Q.   -- just read; correct?

17   A.   In Indiana, yes, sir.

18   Q.   All right.  All right.  And then time passes?

19   A.   Uh-huh.

20   Q.   And eventually, you receive an email.  And I think that's

21   Exhibit 8.

22        Do you have Exhibit 8 in front of you?

23   A.   Yes, sir.

24   Q.   And I believe this is the email that you received on

25   November 10th, 2021, from Stephanie Sheppard where she

29

1  basically introduces herself to you --

2  A.    Uh-huh.

3  Q.    -- as the filing attorney and seeks to arrange a meeting

4  with you to go over the bankruptcy pleadings and finalize them

5  for filing; is that correct?

6  A.    Yes, sir.

7  Q.    Could you read what it says in that email.

8  A.    "Good afternoon, Mr. and Mrs. Gibson.  I hope that all is

9  well.  My name is Stephanie Sheppard, and I am the attorney

10 that will be filing your bankruptcy case.  I would like to

11 schedule a time for us to talk so that I can finalize your

12 petition.

13      "I have availability tomorrow from 9 a.m. to 10 a.m. and

14 then from 1 p.m. to 4 p.m.  Please let me know if these time

15 frames work for you.  I look forward to speaking with you and

16 helping you navigate the bankruptcy process.

17      "Kind regards, Stephanie."

18 Q.    Thank you.  And I believe this has already been admitted

19 into evidence.

20      Was that the first communication that you received from

21 Ms. Sheppard?

22 A.    If I can remember correctly, yes, sir.

23 Q.    Okay.  So you had no contact with her until this point?

24 A.    No, sir.

25 Q.    Did you then have a meeting with her?

30

A.   If I remember correctly, I was at work that day when I got this and -- or that next day, I got it.  I remember either she called me or I called her and said, "I'm at work.  I can call you after work."

And I don't remember exactly if she called me or I called her, but I talked to her on the way home from work that day, and we went over a lot of things.

Q.   Okay.  So when you say the next day, would that be the day after you received this?  This is --

A.   Yes, sir.

Q.   This is dated November 10th, so the next day would be November 11th?

A.   Yes, because I couldn't do those times because I was at work.

Q.   Okay.  And so when did you get off work on November 11th?

A.   Around 4 or 4:30.

Q.   Okay.  And that's when you had a meeting with Ms. Sheppard?

A.   Yes, sir.  We had a phone conversation.

Q.   Okay.  And so it was a telephonic meeting then?

A.   Yes, sir.

Q.   Was it just you and Ms. Sheppard, or was your husband also present?

A.   At the first time, yes.  And I explained to her that I was on the way home and that, when I got home, I would call her

1   back when I was available to get him on the phone, too.

2   Q.    Okay.  So the first conversation was relatively brief?

3   A.    Yes, sir.  I mean, we talked roughly -- she went over a

4   brief couple things.  But then, like I said, I told her I'd

5   call her back.  And when I got home, I called her back while he

6   was available.

7         And I said, "Hey, we're both together now.  Is this a good

8   time to talk to you?"  And that's when we started discussing

9   everything.

10  Q.    Okay.  So then when you got your -- got together with

11  your husband and called her back, you had, I guess, a second

12  telephonic meeting --

13  A.    Yes, sir.

14  Q.    -- with Ms. Sheppard; is that --

15  A.    Uh-huh.

16  Q.    -- correct?

17        Can you tell me what you discussed at that telephonic

18  meeting.

19  A.    She went over everything.  She had basically said, "Let

20  me go over your packet with you, make sure everything is here,"

21  you know, to make sure there was nothing that would stop it

22  from having any issues from being filed.

23        She went over our -- the statement of all of our, you

24  know, assets and everything with us, made sure our tax returns

25  were there, made sure our licenses were there.  She went over,

32

1    you know, the -- I don't think she went over the retainer.

2    I can't remember.  But we basically did go over all of our

3    income, everything we needed to file to make sure everything

4    was there.

5        She told us -- she went over what Chapter 7 was again.

6    She gave us the options of, hey, this is what you -- the

7    difference between the two.  She went over everything again

8    completely with us.

9    Q.   Okay.  I had noticed, when you were giving your testimony,

10   you were gesturing towards the petition and schedules that

11   are --

12   A.   Yes, sir.

13   Q.   -- (indiscernible) Exhibit 3.

14       Did she go over those with you --

15   A.   Yes, sir.  I couldn't think of the words, but yes, sir.

16   Q.   -- for accuracy?  That's --

17   A.   Yes, sir.

18   Q.   And was that the -- was that the primary substance of your

19   telephonic --

20   A.   Yes, sir.

21   Q.   -- conversation?

22       And how long did this conversation last?

23   A.   We probably talked 30 to 45 minutes or so, if not longer

24   some, because we were talk- -- I mean, not to tell her

25   business.  Like, her child was there, and we got to talking

1    about kids and -- I mean, it was very -- it was legalwise, but

2    we were -- it was a very friendly conversation, too, so . . .

3    Q.   Okay.  So other than going over the petition, schedules,

4    statement of financial affairs, and related pleadings --

5    A.   Uh-huh.

6    Q.   -- was there anything else that came up --

7    A.   No.  I mean --

8    Q.   -- that dealt specifically with your bankruptcy?

9    A.   No, sir.  No, sir.

10   Q.   Okay.  All right.  And according to Exhibit 3, if you take

11   a look at the date at the top of the first page --

12   A.   Yes, sir.

13   Q.   -- the petition and schedules were ultimately filed on

14   November 14th; is that correct?

15   A.   Yes, sir.

16   Q.   Okay.  So you were introduced by email to Ms. Sheppard on

17   November 10th; correct?

18   A.   Correct.

19   Q.   And then by the 14th, the petition and schedules were

20   filed?

21   A.   Yes, sir.

22   Q.   Now, between the 10th and the 14th, were there any

23   significant changes that were made to the schedules before they

24   were filed?

25   A.   If I remember correctly, there was something -- there was

34

1   an email and a conversation her and I had.  I had left out
2   something that she had to go back and redo, but I cannot
3   remember exactly what it was.  I do know there was something
4   that she had to --
5   Q.   Are you referring to a trailer, perhaps, that was --
6   A.   Yes.
7   Q.   -- that was left off?
8   A.   Yes, yeah.
9   Q.   I think that was the subject of a --
10  A.   Yes.
11  Q.   -- post-petition amendment --
12  A.   Yes.
13  Q.   -- that came to light after the meeting -- first session
14  of the meeting of creditors.
15       Does that ring a bell?
16  A.   Yes, sir.
17  Q.   Okay.  But that was not an amendment that was made prior
18  to the initial filing; correct?
19  A.   No, because they told us we didn't have to.
20  Q.   Right.  Okay.
21       So my understanding is that there were no significant
22  changes --
23  A.   No, sir.
24  Q.   -- between the 10th and the 14th --
25  A.   No, sir.

1   Q.   -- with regard to what ultimately got filed with the

2   court.

3   A.   No.

4   Q.   All right.  Now, after the case was filed with the court,

5   you were ultimately notified when your meeting of creditors was

6   going to take place; right?

7   A.   Correct.

8   Q.   And you understood that it was going to be a telephonic

9   meeting of creditors; correct?

10  A.   Yes, sir.

11  Q.   Okay.  And did Ms. Sheppard represent you at the meeting

12  of creditors?

13  A.   Yes, sir.

14  Q.   She did; correct?

15  A.   Uh-huh.

16        MR. PASCHKE:  Okay.  All right.  I think that's all

17  the questions I have for Ms. Gibson.

18        Oh, wait a minute.  Hold on one second.  I have to

19  backtrack a little bit.

20  BY MR. PASCHKE:

21  Q.   Now, when we were talking about the intake process and I

22  asked you whether staff other than Ms. Sheppard had talked to

23  you about the difference between secured and unsecured debt,

24  Chapter 7 and Chapter 13, and the -- and so on --

25  A.   Uh-huh.

36

1   Q.    -- you mentioned that some of those things were discussed

2   by Ms. Sheppard as well?

3   A.    Yes.

4   Q.    Okay.  So when you had your prefiling telephonic meeting

5   with her --

6   A.    Uh-huh.

7   Q.    -- what did she discuss with you other than going over

8   the petition, schedules, and statement of financial affairs for

9   accuracy?

10  A.    Just, basically, about the Chapter 7, how -- what the

11  difference was between that and a 13 and how you did have to

12  pay that back and, basically, just the different parts of --

13  the different parts of bankruptcy, nothing as far as, like --

14  I'm trying to think of . . .

15  Q.    Well, I'll just ask the same questions again.

16        Did she specifically discuss with you the difference

17  between secured and unsecured debt?

18  A.    Yes, sir.

19  Q.    Okay.  Did she specifically discuss with you or did she

20  specifically recommend to you that you file Chapter 7 rather

21  than Chapter 13?

22  A.    She said, with our situation, that would be a better

23  option.

24  Q.    Okay.

25          THE COURT:  Which would be a better option?

37

1           THE WITNESS:  Chapter 7.

2           THE COURT:  Okay.

3    BY MR. PASCHKE:

4    Q.   Did she specifically discuss with you the difference

5    between Chapter 7 and Chapter 13?

6    A.   Yes, sir.

7    Q.   And did she specifically discuss with you what exemptions

8    are available to you under Georgia law?

9    A.   Yes, sir.

10           MR. PASCHKE:  All right.  Now I think I am done with

11   my questions for Debora Gibson.

12                              EXAMINATION

13   BY THE COURT:

14   Q.   Ms. Gibson --

15   A.   Yes, sir.

16   Q.   -- do you and your husband own your home?

17   A.   No, sir.  No, Your Honor, we don't.

18   Q.   Do you rent?

19   A.   Yes, we do.

20   Q.   Okay.  Do you own an automobile?

21   A.   We did.

22   Q.   And when you filed this petition --

23   A.   It was included in the bankruptcy.

24   Q.   Included in the sense that you gave it back or --

25   A.   Yes, sir.

38

1   Q.   All right.  What kind of vehicle was it?

2   A.   A 2019 Dodge Durango.

3   Q.   And how much did you owe on it?

4   A.   18,000.

5   Q.   And did you think you could afford to pay for it?

6   A.   No, sir.

7   Q.   Were you behind in your payments?

8   A.   Yes, sir.

9   Q.   How many miles were on the car?

10  A.   115,000.

11  Q.   Okay.  And have you since obtained other transportation?

12  A.   No, sir.

13  Q.   You don't have a car?

14  A.   I drive a truck that his mom is --

15  Q.   Oh, yeah.

16  A.   Yeah.

17  Q.   Okay.  You didn't buy one?

18  A.   No, sir.

19  Q.   Okay.

20  A.   No.

21  Q.   That's good.

22       All right.  And so do you think that the car -- the

23  Durango was worth less than you owed on it actually?

24  A.   Yes, sir.

25  Q.   And why is that?

39

1    A.    Because of the used car values.  They just depreciate as

2    soon as you drive them off the lot.  That, and I was paying

3    $871.  And it was -- our situation at the time, which we're

4    still in, it just wasn't feasible.

5    Q.    But you think the Durango was worth what -- how much do

6    you think it was worth at the time you filed the case?

7    A.    Maybe 10- or 12,000.

8    Q.    Okay.  All right.  Have you and your husband ever been

9    involved in an automobile accident?

10   A.    No, sir.

11   Q.    Does anybody owe you any money?

12   A.    No, sir.

13   Q.    Do you have any claims against anyone?

14   A.    No.  I mean, he's still under the same workers' comp that

15   we were then.  He's still injured.  He's still not working.

16   Q.    Okay.  All right.

17   A.    So . . .

18   Q.    Have you inherited any money or property in your lifetime?

19   A.    No, sir.

20   Q.    Has anybody recently died from whom --

21   A.    No, sir.

22   Q.    -- you expect to inherit?

23   A.    No, sir.

24         THE COURT:  Okay.  All right.  Any other questions,

25   Mr. Paschke?

40

1          MR. PASCHKE:  None from me.  I turn the podium over
2     to Ms. Sheppard.
3          THE COURT:  Ms. Sheppard, any questions?
4          MS. SHEPPARD:  Just a couple.  And you kind of pulled
5     some of it out, Your Honor, because we were going to talk about
6     this car because that was definitely a source of contention.
7          THE WITNESS:  Yeah.
8                         CROSS-EXAMINATION
9     BY MS. SHEPPARD:
10    Q.   And when we filed the bankruptcy --
11    A.   Uh-huh.
12    Q.   -- I explained to you that the lender was probably going
13    to send a reaffirmation agreement to you?
14    A.   Uh-huh.
15    Q.   And did I explain to you what that reaffirmation agreement
16    was --
17    A.   Yes, ma'am.
18    Q.   -- and the consequences of signing that reaffirmation --
19    A.   Yes, ma'am.
20    Q.   -- agreement?  And --
21    A.   You told me not to.
22    Q.   Because we -- in explaining the process of Chapter 7 to
23    you, you were seeking a fresh start; correct?
24    A.   Yes, ma'am.
25    Q.   And that was because of --

41

1    A.    Yes.

2    Q.    -- the issues with your husband being hurt --

3    A.    Uh-huh.

4    Q.    -- things of that nature?

5          And as the process went on through the bankruptcy, if you

6    or Mr. Gibson had any questions, were -- was I available to be

7    able --

8    A.    Yes, ma'am.

9    Q.    -- to answer those questions?

10         So --

11   A.    Yes, ma'am.

12   Q.    -- you were able to get in contact with me and --

13   A.    I'd text you or call you or anything, yes, ma'am.

14   Q.    Okay.  And I'm going to go back to the retainer agreement

15   that you signed with Recovery Law Group --

16   A.    Uh-huh.

17   Q.    -- because I was not -- I wasn't in the picture at that

18   point in time.

19   A.    Yes, ma'am.

20   Q.    But you indicated that you reviewed and you signed the --

21   A.    Uh-huh.

22   Q.    -- retainer agreement with Recovery?

23         Did you understand how much you were paying for your

24   services for the Chapter 7 bankruptcy?

25   A.    Yes, ma'am.

42

1    Q.   All right.  And what was your understanding of what your

2    payment was?

3    A.   It's around 3- to 400, if I remember correctly, for the

4    filing fees.

5    Q.   Uh-huh.

6    A.   And the rest of it was attorney -- basically the attorney

7    fees.

8    Q.   Okay.

9    A.   And the reason why I went with Recovery was because I had

10   called locally around here, and there weren't too many that

11   would make payments.  And in our situation at the time, I

12   couldn't afford to do it all at once.

13   Q.   Okay.  All right.  So you understood who you were hiring?

14   A.   Yes, ma'am.

15   Q.   You understood how much your payments were going to be

16   between the attorney's fees and the court filing fees?

17   A.   Yes, ma'am.

18   Q.   Were you satisfied with the services that I provided?

19   A.   Yes, ma'am.

20            MS. SHEPPARD:  Okay.  I think that's all that I have.

21            THE COURT:  Ms. Gibson, a couple of questions.

22            THE WITNESS:  Yes, sir.

23                         FURTHER EXAMINATION

24   BY THE COURT:

25   Q.   In the petition and the schedule -- Schedule B, Page 17 of

43

1    67, it shows that Santander was your vehicle lender.

2    A.   Yes, sir.

3    Q.   And you had 67,000 miles on your Dodge Durango, but you

4    show that it had a value of 27,000.

5    A.   Oh, I might have been wrong.

6    Q.   Well --

7    A.   I think that's what they -- yes.  I think that's what I

8    owed at the time.

9    Q.   Well, this says you owe 36,000 and you think it's worth

10   27,660.

11   A.   Oh.

12   Q.   These are your numbers, so I'm asking --

13   A.   And that was, what, 2 years ago, so I'm -- probably was

14   thinking today's numbers, honestly.  But, yes, sir, I probably

15   did think it was twenty-seven six.

16   Q.   Okay.  Fair enough.  All right.

17        Now, I noticed among your debts, it looks like a -- do you

18   have a student loan?

19   A.   My husband did -- does.

20   Q.   And what discussion did you have with Ms. Sheppard about

21   how your bankruptcy would affect that student loan?

22   A.   That they would not be -- they would be -- stop the

23   garnishments, but it wouldn't be -- some -- it depended on what

24   kind they were.  Some were not forgiven in bankruptcy.  I do

25   remember that.

44

```
1    Q.   Were you garnished for your student loan?

2    A.   My husband was.

3    Q.   And did they stop garnishing?

4    A.   Yes, sir.

5    Q.   And have they restarted garnishing?

6    A.   No, sir.  We've been making little payments at a time --

7    Q.   Oh, okay.

8    A.   -- while it's been forgiven through the Government right

9    now.

10   Q.   Okay.  Fair enough.

11            THE COURT:  All right.  Mr. Paschke?

12            MR. PASCHKE:  Okay.  Redirect, Your Honor.

13                      REDIRECT EXAMINATION

14   BY MR. PASCHKE:

15   Q.   There was some testimony just a few minutes ago about the

16   Chapter 7 retainer agreement.  Ms. Sheppard asked you whether

17   you knew who you were hiring.

18        Who was it that you were hiring through this --

19   A.   Recov- --

20   Q.   -- chapter 7 retainer agreement?

21   A.   Recovery Law Group.

22   Q.   That's correct.

23        Was there any mention of Ms. Sheppard in any of this

24   Chapter 7 retainer agreement?

25   A.   No, sir.
```

45

1          MR. PASCHKE:  Okay.  Thank you.  No further
2     questions.
3          THE COURT:  Thank you, Ms. Gibson.
4          THE WITNESS:  Thank you, Your Honor.
5          THE COURT:  All right.  So just to catch up,
6     Mr. Paschke, did you tender Exhibit --
7          MR. PASCHKE:  I think we have --
8          THE COURT:  -- 6?
9          MR. PASCHKE:  Exhibits 1, 2, 3, 6, 7, and 8 have been
10    admitted into evidence.
11         THE COURT:  Did I admit all six?  I know 8 was
12    stipulated to, but we admitted 6 and 7 --
13         MR. PASCHKE:  That's correct, Your Honor.
14         THE COURT:  -- over Counsel's objection.
15         Okay.  Very good.
16         MR. PASCHKE:  Now, Your Honor, I had spoken with
17    Ms. Sheppard prior to the hearing today about her offering to
18    give a statement or perhaps I ask her a few questions about her
19    role in the process.  And I think she was amenable to doing
20    that, so I would ask if she would be still willing to do that.
21         THE COURT:  I think you may -- excuse me.  I think
22    you may call her as a witness.
23         MR. PASCHKE:  Yes.  That's what I intend to do,
24    Your Honor.
25         Ms. Sheppard, I'd like you to take the stand.

46

1          MS. SHEPPARD:  Absolutely.  No problem.

2                    STEPHANIE SHEPPARD,

3     having been duly sworn, was examined and testified as follows:

4                    DIRECT EXAMINATION

5     BY MR. PASCHKE:

6     Q.    Thank you for being here today, Ms. Sheppard.

7     A.    You're welcome.

8     Q.    We've already heard some testimony this morning about

9     RL -- Recovery Law Group, or RLG, as I refer to it.

10          Could you briefly describe your role in the process of

11    bringing a Recovery Law Group case to be filed with the

12    bankruptcy court.

13    A.    Sure.  So as a -- I think I need to explain what my role

14    was before I can fully answer your question.

15          So I was employed as a non-equity, non-voting partner --

16    that's a mouthful -- of Recovery Law Group.  As such, Recovery

17    did our marketing, you know, to be able to bring clients in,

18    things like that.  Recovery had -- the clients executed their

19    retainer agreements with Recovery Law Group.

20          So with that being said, Recovery functioned for me as a

21    paralegal, for lack of a better way to describe the situation.

22    Recovery gathered financial documents, as Ms. Gibson has

23    testified to, bank statements, tax returns, things of that

24    nature, and Recovery also did the basic data entry for the

25    petitions and the schedules.

47

1          Once that was done and the clients had made all required

2    payments, then Recovery would forward me the electronic file.

3    So I would get an electronic file with the financial documents.

4    You know, if there were any lawsuits, child support issues like

5    that, those documents would come over as well -- as well as

6    a -- as well as an electronic Best Case copy of the file.

7          So once I received all of that information, I would review

8    bank statements, tax returns, and any other legal documents

9    that came over as well and then schedule a consultation call

10   with the client so that we could go over the petition and the

11   schedules line by line to ensure that all of the information

12   that they were including in there was true and correct.  After

13   that was done, then the case would be filed.

14   Q.   Okay.  I think that's a pretty good description.

15        And, in fact, you did sign an employment contract with

16   Recovery Law Group; correct?

17   A.   That is correct.

18   Q.   And that's Exhibit Number 1.  I think it might still be --

19   A.   Yeah.

20   Q.   -- in front of you.

21        I'm just going to open it up.  Buttressing your testimony

22   from just a moment ago, under Scope of Services -- this is on

23   Page 2 of 8 under Numeral 1(a), it describes your role as --

24   well, could you read what it says under 1(a).

25   A.   1(a), "Attorney will sign as a non-equity, non-voting

48

1    partner member of RLG.  Attorney's position will be a part-time

2    contract position."

3    Q.    Right.  I think that describes your role with RLG.

4          Did you have any supervisory authority over paralegals or

5    attorneys in-house collecting data and preparing the initial

6    draft of petitions, schedules, statement of financial affairs,

7    and the like?

8    A.    I did not have any managerial or supervisory roles with

9    Recovery Law Group.

10   Q.    With regard to the intake process or anything else?

11   A.    With nothing.

12   Q.    Okay.  How were you compensated?

13   A.    I was compensated -- and that's actually -- that's on the

14   following page.  That would --

15   Q.    Right.

16   A.    -- be 3 of 8.

17         For each Chapter 7 case, it was $300.  If it was a

18   Chapter 13, it was $350.  And then once the case was confirmed,

19   it was an additional $350.

20         And the rest of it that they outline and describe, I never

21   got into that, so that -- so those two sections, 2(b) and (c),

22   is primarily the way that I was compensated from Recovery.

23         So what I would do is after -- after cases were filed, I

24   would submit an invoice to the managing partner -- his name was

25   Nicholas Wadja.  And I'm probably butchering his last name.

49

1  It's W-a-d-j-a -- and outline the cases.  So it would be the

2  case name, case number, which district it was filed in --

3  because I am admitted in all three districts: Northern, Middle,

4  and Southern District -- and case number and the date that the

5  case was filed.

6  Q.   Okay.  So, basically, your compensation schedule, if we

7  could call it that, is set forth on Page 3 of 8 under Number 2,

8  "Compensation and Salary," of Exhibit 1; correct?

9  A.   That's correct.

10 Q.   Okay.  And you indicated that you only filed Chapter 7 and

11 Chapter 13 cases, so Paragraphs B and C would be your primary

12 means of compensation; correct?

13 A.   That's correct.

14 Q.   Okay.  And after you submitted an invoice, then you would

15 get paid, for example, $300 for a Chapter 7 case that you

16 filed; is that correct?

17 A.   That's correct.

18 Q.   And did you get paid $300 for filing the Gibsons' case?

19 A.   Yes, I did.

20 Q.   Okay.

21      THE COURT:  Well, let me -- let me digress a moment.

22 I find this a little fascinating.

23      Did you file any Chapter 13 cases?

24      THE WITNESS:  Yes.

25      THE COURT:  How many?

1          THE WITNESS:  Not a whole lot.  I want to say maybe

2     about -- maybe about four or five.  There wasn't a whole lot of

3     Chapter 13 cases.

4          THE COURT:  All right.  And as part of a package of

5     documents that you filed with the court, you would have a

6     disclosure of fees; right?  But I'm assuming -- I'm assuming,

7     if you got paid $350 for a Chapter 13 by RLG, they got paid

8     a lot more; right?

9          THE WITNESS:  Correct.  And I -- and I'll say this

10    to you.  Once the cases were sent over to me, I did not get the

11    retainer agreement between Recovery and the client.

12          THE COURT:  So how did you file -- prepare and file

13    the Rule 2016 disclosure of compensation statement in the

14    Chapter 13?

15          THE WITNESS:  So that information, as far as what the

16    debtors had paid, was already included because once the -- once

17    the case was sent over to me, it was a Best Case file, so all

18    of that information was already plugged in.

19          I want to say that my bank- -- my Chapter 13 cases

20    were primarily in the Middle District of Georgia, and the

21    Middle District has a cap on what your fees can be in a

22    Chapter 13 case.  So I had to let Recovery know, look, you

23    can't charge these people more than 3,250, because that's the

24    cap on a Chapter 13 case, so they would know that their fees

25    could not exceed that 3,250.

51

1          THE COURT:  All right.  But did you prepare the

2     Rule 2016 statement in each of those Chapter 13 cases?

3          THE WITNESS:  No.

4          THE COURT:  They prepared it?

5          THE WITNESS:  Yes.

6          THE COURT:  All right.  And, I mean, is that

7     something you're going to be going over, Mr. Paschke?

8          MR. PASCHKE:  I think we will, Your Honor.

9          THE COURT:  Okay.  All right.  I didn't mean to

10    interrupt.  Go ahead.

11          THE WITNESS:  No worries.

12          MR. PASCHKE:  No problem.

13          THE WITNESS:  Like I said, I'm just --

14    BY MR. PASCHKE:

15    Q.  We're just talking about --

16          THE WITNESS:  -- (indiscernible).

17    BY MR. PASCHKE:

18    Q.  We were just talking about your employment contract with

19    RLG.  Let's skip over for a second and talk about the retainer

20    agreement -- the Chapter 7 retainer agreement between RLG and

21    Rodney and Debora Gibson.  I don't have --

22    A.  That was Exhibit 1?

23    Q.  Yeah.  This is Exhibit 2.

24    A.  Oh, okay.

25    Q.  Now, I don't have a lot of questions about this.  I think

52

1   it's pretty self-explanatory.  I just want to ask a couple of

2   follow-up questions that I don't think Mr. or Mrs. Gibson could

3   answer.

4        This Chapter 7 retainer agreement, or this copy of it that

5   we were able to offer the court today, was not provided to me

6   by Mr. and Mrs. Gibson, but it was forwarded to me by you;

7   correct?

8   A.   That's correct.

9   Q.   And you testified just a moment ago that this is not

10  one of the documents that you would typically receive when a

11  package of bankruptcy materials comes to you for filing;

12  correct?

13  A.   That's correct.

14  Q.   So you had to go to Recovery Law Group to obtain a copy of

15  this so that you could forward it to me; correct?

16  A.   That is correct.  I contacted Recovery and said that the

17  UST was requesting a copy of the Chapter 7 retainer agreement,

18  and they forwarded the agreement to me.

19  Q.   Now, is this the -- is this the only agreement that

20  exists?  In other words, there's not another one floating

21  around with Mr. Gibson's signature on it somewhere, is there?

22  A.   No.  This is all that I have.  This is all that I'm aware

23  of.

24  Q.   Okay.  Because I think we -- I think we asked to see if

25  there was any other contracts, and I think the representation

1   was that this is the only agreement that exists; correct?

2   A.   This is what they sent me, and this is as far -- as far as

3   I'm aware of, this is all that exists.

4   Q.   Okay.  I appreciate you confirming that.

5        Let's turn our attention now --

6             THE COURT:  Well --

7   BY MR. PASCHKE:

8   Q.   -- to --

9             THE COURT:  -- while we're discussing it, what is the

10  last page, this HelloSign audit trail?  What -- is that

11  supposed to indicate that Mr. -- that Rodney signed it?  I see

12  a little signature.

13            THE WITNESS:  So looking at this document history,

14  Your Honor, it shows when the agreement was sent out.  So the

15  agreement was sent out June 15th, 2021, at 11:05 UTC.  I'm not

16  sure what time that is.  That was somebody's time, maybe

17  someone on the west coast, mountain time.  I don't know.  But

18  then it shows that it was viewed on June 15th, 2021, at 11:10,

19  and then it was signed on June 30th, 2021, at 4:13.

20            THE COURT:  All right.  So that little scribble, is

21  that --

22            THE WITNESS:  That's not his actual signature.

23            THE COURT:  what?

24            THE WITNESS:  That's not his actual signature.

25            THE COURT:  Yeah.  But, I mean, it looks like he at

54

1    least initialed it; is that --

2         THE WITNESS:  So what I -- and Mr. Paschke and I

3    actually had a conversation about this, and what I was

4    explaining to him is when you're doing electronic signatures

5    and you have two parties that need to sign it, the best way to

6    do that is to be able to have two different email addresses.

7    The georgiabulldog email address belongs to Mr. Gibson, which

8    is why his name appears there.  But while it came into his

9    email, Mrs. Gibson is the one that actually executed it.

10        So in order to have both of their signatures on this

11   document, it would have needed to have been sent to them and

12   had to have two separate email addresses, so Mr. Gibson's email

13   address and then Mrs. Gibson, you know, assuming that she has

14   a separate email address.  That would have needed to have been

15   put in so that both signatures could have been captured.

16        MR. PASCHKE:  And, Your Honor, the only point I'm

17   making is that there's no written-out electronic signature for

18   Mr. Gibson.  The last -- you know, I mentioned in my motion,

19   Your Honor, in a footnote that the last page of Exhibit 2 does

20   show a viewing history and that it may have been signed by

21   Mr. Gibson on June 30th, but the point being is that there's no

22   actual copy with his signature on it that was provided to me or

23   that was available to the debtors or to Ms. Sheppard when she

24   requested one.

25        Okay.  So we talked about the employment contract

1  between Ms. Sheppard and RLG.  We talked about the retainer

2  agreement between the Gibsons and RLG.  Ms. Sheppard explained

3  her role in the process.  And I'm just going to paraphrase and

4  see if she agrees with my summary of her testimony.

5  BY MR. PASCHKE:

6  Q.   It's my understanding, based on your testimony, that staff

7  people within Recovery Law Group prepared the initial draft of

8  the petition, schedules, statement of financial affairs, and

9  related pleadings.

10  A.   Correct.

11  Q.   And that would include the statement of attorney

12  compensation that appears at the end of -- I guess it's

13  Exhibit 3; correct?

14  A.   Correct.

15  Q.   Okay.  And we already established that you don't have any

16  supervisory authority over anybody at -- in-house or any other

17  staff at Recovery Law Group; correct?

18  A.   That is correct.

19  Q.   Okay.  So let's turn our attention now to Exhibit 3 for

20  a second.  And I'm just going to open up to Page 7 of 67, and

21  you'll see the signature block here.

22  A.   Uh-huh.

23  Q.   And you'll see the signature that you signed as

24  attorney's -- or debtors' counsel of record; correct?

25  A.   Correct.

1   Q.   And it says "Stephanie K. Sheppard," and it references

2   Sheppard Legal Services, LLC; correct?

3   A.   Correct.

4   Q.   But there's no mention of Recovery Law Group, is there?

5   A.   No, sir.

6   Q.   Okay.  So let's go to -- let's go to the attorney

7   compensation disclosure form.  And I think it's at the tail end

8   of Exhibit 3.  It's on Page 64 of 67.

9   A.   Okay.

10  Q.   Okay.  Now, a moment ago, I think you testified that

11  at least the initial draft of this document would have been

12  prepared by Recovery Law Group in-house; is that correct?

13  A.   That's correct.

14  Q.   So this would have been one of the prepared documents that

15  came to you with the bankruptcy file when you were preparing to

16  meet with Mr. and Mrs. Gibson to go over it; correct?

17  A.   That's correct.

18  Q.   Okay.  So did you review this document --

19  A.   Yes.

20  Q.   -- for your own -- for your own benefit?

21  A.   Uh-huh.  I did.

22  Q.   And did you -- did you think that it needed any changes to

23  be made to it?

24  A.   It covered the fees that the Gibsons paid, court filing

25  fees, that they had already been paid; that there was -- let me

57

1   see there -- (inaudible).  I had agreed not to share their

2   close -- compensation.

3   Q.   I guess it was a yes-or-no question.  If you didn't --

4   A.   I was just looking over it, so yeah.

5   Q.   If there's -- if there's no -- if there's nothing that you

6   thought needed to be changed, then, obviously, the --

7   A.   Right.

8   Q.   -- answer would be no.

9        I'm just going to point out a couple of things.  It says

10  "Prior to the filing of this statement, I have received

11  $1,500."

12       But you didn't receive that personally; correct?

13  A.   I didn't -- that's correct.  I did not receive --

14  Q.   And it was paid to Recovery Law Group --

15  A.   That was --

16  Q.   -- correct?

17  A.   -- paid to Recovery.

18  Q.   And $1,500 is the amount of the attorney's fees only;

19  correct?

20  A.   Correct.

21  Q.   The full amount that was paid to Recovery Law Group was

22  the 1,500 in attorney's fees plus another three hundred and --

23  A.   -38.

24  Q.   -- thirty-eight dollars for the court filing fee; correct?

25  A.   Correct.

58

1    Q.    Okay.  And down at the bottom of the page, we see the

2    certification, "I certify that the foregoing is a complete

3    statement of any agreement or arrangement for payment to me for

4    representation of the debtors in this bankruptcy proceeding."

5         And that is signed.  Again, there's a signature block for

6    you, Stephanie Sheppard; correct?

7    A.    Correct.

8    Q.    And, again, the reference here is Sheppard Legal Services,

9    LLC; correct?

10   A.    Uh-huh.  That's correct.

11   Q.    And there's no reference here to Recovery Law Group;

12   correct?

13   A.    That's correct as well.

14   Q.    All right.  Nor is there any reference in the disclosure

15   of compensation that Recovery Law Group was receiving any

16   portion of the $1,500 in attorney's fees; correct?

17   A.    In the disclosure -- in the disclosure?

18   Q.    In the disclosure of compensation of attorneys on Page 64

19   of 67.

20   A.    Right.  That is not -- is not indicated there.  It's

21   indicated in the statement of financial affairs.

22   Q.    That's correct.

23   A.    And let me go ahead and clear up something for you because

24   you're referencing my signature block here.  So once the files

25   were sent over to me -- like I said, there was a Best Case file

1    that was sent to me electronically from Recovery Law Group.

2         I would take that electronic file and open it up into

3    my software because I, too, maintain the Best Case software

4    because I -- I do bankruptcy work independent of Recovery Law

5    Group.  You know, I have my own ECF so that I can e-file.  So

6    once I open up the documents in there, my signature block

7    attaches, which has my name and my firm information in here.

8         I provided my own Best Case software.  That's not

9    something that Recovery provided to me.  Same thing with my

10   ECF.  I had my ECF filing information long before I started

11   working with Recovery, so that's why you will see my name and

12   my firm listed there.

13   Q.   If we take a look at Page 51 of 67, I think that's the

14   Statement of Financial Affairs Question 16 that talks about --

15   A.   Give me the page number again, Mr. Paschke.

16   Q.   Yeah.  It's Page 51 of 67.  I think you just referred to

17   it a moment ago in your testimony.

18   A.   Yes.

19   Q.   And this is the entry on the statement of financial

20   affairs that talks about what Recovery Law Group ABC received;

21   correct?

22   A.   Yes.

23   Q.   Okay.  And, again, in this -- in this disclosure, there's

24   no disclosure made that you have any association or affiliation

25   with Recovery Law Group; is that correct?

60

1   A.   This just simply says that Recovery Law Group received

2   $1,838 in attorney's fees and filing fees.

3   Q.   Thank you.  Let's see.  Where do we go next?

4        Okay.  I think we're just going to go over some ground

5   that we may have already covered with Ms. Gibson, but we'll get

6   your point of view on it.

7        Let's start with Exhibit 8.  And that's the

8   introduction --

9   A.   That's my email.

10  Q.   That's the introduction email that you sent to the

11  Gibsons.

12  A.   Yes.

13  Q.   That's the email introduction that you sent to the Gibsons

14  to set up a meeting to go over their -- go over and finalize

15  their petition, schedules, statement of financial affairs, and

16  related pleadings so that they could be filed with the

17  bankruptcy court; is that correct?

18  A.   That's correct.

19  Q.   Okay.  And you then subsequently arranged to have a

20  telephonic meeting with them; correct?

21  A.   Correct.

22  Q.   And that -- did that occur the next day, as they

23  testified?

24  A.   Yes.

25  Q.   Okay.  And did you go over the bankruptcy pleadings with

61

1   them at that time?

2   A.   I did.

3   Q.   Okay.  And approximately how long were you at it?

4   A.   We probably -- I want to say maybe, like, 45 minutes to an

5   hour, we were on -- that we were on the phone.

6   Q.   Okay.  And I think you testified earlier that you went

7   over the petition, schedules, statement of financial affairs on

8   more or less a line-by-line basis; is that correct?

9   A.   That's correct.

10  Q.   Okay.  And were there any significant changes that you had

11  to make between the time that you received the package from

12  Recovery Law Group and its initial Best Case draft and the time

13  that you ultimately filed it?  Were there any significant

14  changes that you had to make?

15  A.   There weren't any significant changes.  There were a

16  couple of changes that the Gibsons made but nothing

17  far-reaching.

18  Q.   Okay.  And as we already discussed, you did ultimately

19  file the case; correct?

20  A.   That's correct.

21  Q.   You did appear at the meeting of creditors?

22  A.   Yes, sir.

23  Q.   And, ultimately, you did get paid by Recovery Law Group;

24  correct?

25  A.   That's correct.

62

Q.   Okay.  And the amount of your payment, I think we
established, was $300?

A.   That's correct.

Q.   And your understanding, I guess, is that the remaining
$1,200 of attorney's fees was retained by Recovery Law Group?

A.   That would be my best guess.

MR. PASCHKE:  All right.  At this point, I think I
don't have any further -- I don't have any further questions.

THE COURT:  Let me just ask a few questions,
Ms. Sheppard.

THE WITNESS:  Certainly, Your Honor.

EXAMINATION

BY THE COURT:

Q.   Where did you go to law school?

A.   Emory.

Q.   And what year did you graduate?

A.   2016.

Q.   Where did you attend undergrad?

A.   University of West Georgia.

Q.   In Carrollton?

A.   In Carrollton, yes, sir.

Q.   Okay.

A.   It was a West Georgia college (indiscernible).

Q.   Yeah, yeah.  And you said you have your own practice now?

A.   Yes, sir.

63

1   Q.   Do you have an office space where clients can come meet

2   you?

3   A.   Yes, sir.

4   Q.   And where is that located?

5   A.   My current address is 2727 Paces Ferry Road, Building 1,

6   Suite 750, Atlanta 30339.  And I've been there almost since

7   about September of 2022.  Prior to that, I was at 1141 Sheridan

8   Road.  My landlord sold the building, so I had to find another

9   home.

10  Q.   Okay.  And do you practice by yourself?

11  A.   Yes.

12  Q.   Okay.  Do you have staff? paralegals?

13  A.   I do not have any staff.

14  Q.   Okay.  And do you practice anything other than bankruptcy?

15  A.   Yes.  My practice is -- and it's tilting a little more

16  now, but it used to be almost equally divided between

17  bankruptcy work and probate and estate planning.  You know,

18  courtesy of COVID, my probate business got a boost, so -- but,

19  yeah, those are my two areas that I practice in.

20  Q.   Okay.  Do you still accept cases from RLG?

21  A.   I do not.  I terminated my agreement with them June of

22  2022.  Yeah, it was June.

23  Q.   Okay.  And any other courts in -- you practice just in

24  Georgia; right?

25  A.   That's correct.

64

1   Q.   Have any of the other bankruptcy judges had to talk to you

2   about your relationship with RLG?

3   A.   No.

4   Q.   Okay.  All right.  So one of the things that I find

5   interesting about this business model is the question of the

6   timing of the petition -- well, in particular in this case, the

7   timing of the petition.

8        Would you agree with me that bankruptcy matters are

9   sometimes very time-sensitive?

10  A.   Oh, absolutely.

11  Q.   For example, when people are getting garnished, they want

12  immediate relief; right?

13  A.   That's correct.

14  Q.   So did Mr. Gibson continue to get garnished between the

15  June and November time frames?

16  A.   I am not sure.  I -- like I said, when I sent out my email

17  to them, I probably got the case within a day or two because my

18  turnaround was kind of quick for the very reason that you

19  cited.  So prior to receiving the file, I could not tell you

20  what transpired in the case.

21  Q.   Okay.  Yeah.  So, I mean, I'm not saying the delay was

22  caused by you.

23       They -- RLG brings you in at the last minute when they've

24  done all their --

25  A.   Uh-huh.

1  Q.   -- their work?

2  A.   And I've talked to people before that said that their

3  process had gone on for almost a year.

4  Q.   Okay.  All right.  Now -- so you're -- when you do other

5  bankruptcy cases, you're familiar with the no-look fee you get

6  in court; right?

7  A.   Yeah.

8  Q.   Is it, what, 4,500? 5,000?

9  A.   45- --

10 Q.   Okay.

11 A.   -- unless it's been increased.  Let me know.

12 Q.   Well, I'm just curious.  In a Chapter 13, at least the

13 lawyers that appear before me, they sometimes come to court,

14 what, five or ten times in a single case.

15 A.   With a 13?

16 Q.   Yeah.

17 A.   Absolutely.

18 Q.   Yeah.  So I just -- I don't understand how you could do it

19 for 350 bucks.

20 A.   So I'll explain because most people would look at this and

21 be like -- I had a colleague that looked at it, and he was

22 like, "Are you" -- he -- it boggled him.  He was like, "How and

23 why?"

24      So part of the how is -- or part of the why is this.  And

25 I knew that, especially in Middle -- in the Middle and Southern

66

1    Districts, sometimes people could not find representation.  And

2    it was with pleasure that -- it was the pleasure that I had to

3    be able to service people who may not have otherwise been able

4    to get counsel.  So I was willing to do that.

5         Like I said, I do have another side of my practice with my

6    probate work or whatnot.  So while I wasn't necessarily making

7    a whole lot of money with these people, I was able to help

8    people and be able to provide service to some people who may

9    not have otherwise been able to get it.

10   Q.    Okay.  All right.   I actually thought your explanation

11   was going to be that you didn't have an office and, therefore,

12   financially, it made sense because you could just do everything

13   online and show up to court and, if you made 350 bucks, it

14   would work out to a -- you know, a wage, so to speak.  But

15   I'm -- so -- but anyway, I accept your explanation about that.

16        Are you -- the disclosure form that we looked at at

17   Page --

18   A.    I think it was 51.  Let me -- no.  The disclosure was 64,

19   I think.  Yeah, 64.

20   Q.    Yeah.  So it references Bankruptcy Rule 2016(b).

21   A.    Uh-huh.

22   Q.    You're familiar with that rule; right?

23   A.    Yes, sir.

24   Q.    And what do you -- what's your understanding of that rule?

25   A.    That I would be the attorney that's receiving funds for

67

1    the legal services.

2    Q.    All right.

3    A.    That's streamlined.

4    Q.    Short version?

5    A.    The CliffNotes version.

6    Q.    All right.  Well -- so I guess my concern is that the

7    actual requirement -- or one -- part of 2016(b), in addition

8    to the statement required, which this document is designed to

9    fulfill, I believe, it requires that you indicate whether the

10   attorney has shared or agreed to share the compensation with

11   any other entity.  And I think the -- you know, one of the

12   several problems with this case, as the U.S. Trustee sees it,

13   is that -- that you did share the fees.

14        And I'm wondering whether you -- you view your sharing --

15   that you didn't share your 350 -- your 300; therefore, you

16   didn't need to disclose that.  Or do you view it that the total

17   $1,800 fee was shared between you and RLG?

18   A.    I don't think that -- I don't think that I shared the fee.

19   And part of -- and you're the expert.  You do this daily.

20   Because of my employment relationship with RLG, I'm not sure --

21   let me find it in here.

22        So in my -- in my employment agreement, it -- well, not --

23   this is not the employment agreement.  This is the retainer

24   agreement that Mrs. Gibson signed.  They go over and say that

25   the compensation will not be shared with any other person

68

1   unless they are a member of the firm.

2       So I was a member of the firm even though I was non-voting

3   and non-equity.  So, you know, I didn't tell anybody what to

4   do.  I didn't make any decisions.  But I was a member of this

5   firm.

6   Q.   Okay.

7   A.   And I was -- like I said, I'm just not real sure, but I

8   don't -- like I said, I don't view it as I shared --

9   Q.   Okay.

10  A.   -- fees.

11  Q.   All right.  That's fair enough.

12          THE COURT:  All right.  Very good.

13          All right.  Mr. Paschke, do you have any other

14  questions?

15          MR. PASCHKE:  Hold on one second.  I think we've

16  covered the bases, Your Honor.  And I don't want to draw out

17  the proceedings any longer, so I think I'm going to conclude

18  my questions at this time, Your Honor.

19          MS. SHEPPARD:  Can I just -- if I could, I'll just

20  add that I think that what drew the trustee's attention is the

21  fact that, on the disclosure --

22       (An off-the-record discussion was held.)

23          MS. SHEPPARD:  On the disclosure and the other form,

24  because the signature block has my firm's -- my individual

25  firm's information on it rather than Recovery's information on

1    it.  So if -- based off of what I'm understanding, if -- on the

2    disclosure, if it was signed off and I -- and it was reflecting

3    Recovery Law versus Sheppard Legal Services, then there

4    wouldn't have been an issue with it.

5            And like I explained to the Court, once these files

6    were sent to me, I opened them up in my bankruptcy -- my

7    personal Best Case bankruptcy software, which autopopulates all

8    of my information.  And, of course, when I'm doing my ECF

9    filings, that information is automatic- -- you know, from when

10   I set up the account, all of my information automatically

11   populates there.

12           But -- let me see here.  I just made a couple of

13   notes.  Okay.  That was that.  I think that's all -- I think

14   that's pretty much all that I have, Your Honor.

15           THE COURT:  Okay.  Very good.

16           Anything else?

17           MR. PASCHKE:  Nothing from the U.S. Trustee,

18   Your Honor.

19           THE COURT:  All right.  Any other testimony or

20   evidence you want to present or . . .

21           MS. SHEPPARD:  No.  Actually, Your Honor, I had

22   printed out the contract.  I printed out the retainer

23   agreement.  So when Mr. Paschke and I spoke this morning, we

24   pretty much had the same --

25           THE COURT:  Right, right.  Okay.  I think I have a

1   good, fulsome record before me, so -- all right.  Well, you can

2   take your seat.

3           And, Mr. Paschke, do you want to argue the case?

4           MR. PASCHKE:  Your Honor, the -- the arguments that

5   we listed in our -- in our motion are the ones that we're

6   standing on today, and, in brief, I'll try to go through them.

7           First, the disclosure compensation form filed

8   pursuant to Section 329 and 20- -- Rule 2016(b)(6) that

9   Attorney Stephanie Sheppard agreed to accept $1,500 to

10  represent the debtors in their bankruptcy case and that she,

11  in fact, received $1,500 from the debtors prior to filing the

12  case -- again, the form does not disclose any affiliation or

13  fee sharing with Recovery Law Group.  The disclosure states

14  that Ms. Sheppard did not share compensation with anyone who

15  was not a member or an associate of her law firm.  In the

16  certification section of the disclosure form, Ms. Sheppard's

17  law firm is identified as Sheppard Legal Services, LLC.

18          Obviously, there's some contrast between the

19  disclosure of attorney compensation and the disclosure in

20  response to Line 16 of the statement of financial affairs,

21  which states that Recovery Law Group got paid $1,838 for the

22  attorney fees plus the court filing fee.  But even in that

23  disclosure, Your Honor, there's no mention of any affiliation

24  between Ms. Sheppard and RLG.

25          Section 329 governs the disclosures that need to be

1   made.  And I cite a number of cases in my brief, but I want to

2   make the point that Ms. Sheppard is shown both as the attorney

3   of record on the petition and as the attorney signing the

4   disclosure of compensation form.

5        According to the debtors, Ms. Sheppard did not appear

6   to perform many of the legal services disclosed as being

7   covered by the flat fee.  In my view, most of these services

8   were, in fact, performed by the staff at RLG that actually did

9   the meat of the task of collecting information and assembling

10  the initial draft of the petition, schedules, statement of

11  financial affairs, and even the attorney compensation

12  disclosure form, which apparently was not modified much between

13  the time that it was received by Ms. Sheppard and the date that

14  it was ultimately filed with the Court.

15       Yes.  Other RLG staff handled all the pre-petition

16  services.  And in a Chapter 7 filing, that's the majority of

17  the work.  Once a case is prepared for filing and it gets

18  filed, there's not much left to do other than represent the

19  debtor at the 341 meeting and wait for the discharge order to

20  be entered.  And this appears to be one of those cases.

21       Ms. Sheppard's agree- -- arrangement with RLG that

22  she was paid $300 for filing the petition was not disclosed

23  anywhere in the statement of financial affairs or in the

24  attorney compensation disclosure form.  As a result, we view

25  Section 329 of Bankruptcy Rule 2016(b) were not complied with;

72

the disclosures were incomplete; and that the Court is well
within its grounds to order disgorgement of fees in favor of
the debtors.

Section 707(b)(4)(C) is also in play here, which
requires that when an attorney signs a petition, the signature
constitutes certification that the attorney has performed a
reasonable investigation into the relevant circumstances.

Among other responsibilities, the duty of reasonable
investigation requires an attorney to explain the requirement
of full, complete, accurate, and honest disclosure of all
information required of Debtor and, most importantly, to ask
probing and pertinent questions designed to elicit full,
complete, accurate, and honest disclosure of all information
required of a debtor.

Again, most of that was done in the first instance by
Recovery Law Group.  And that makes sense because of the way
that the fees were disbursed in this case -- or split between
Ms. Sheppard and Recovery Law Group.  $1,500 of attorney's fees
were split 1,200 for Recovery Law Group, who did the lion's
share of preparing the petition, schedules, statement of
financial affairs, and related documents for filing, and then a
rather minor amount, $300, to Ms. Sheppard for filing the case
and appearing at the 341 meeting.

The small fee paid to Ms. Sheppard is problematic for
another reason.  It disincentivizes local contract attorneys

1 like Ms. Sheppard from investing any significant amount of time

2 in providing pre-petition services and counseling for debtors.

3 And, presumably, the local contract attorney is the one that's

4 familiar with Georgia law and local bankruptcy court case law

5 involving exemptions, state relief, (indiscernible) avoidance,

6 and any number of common issues that arise in bankruptcy cases

7 in the Southern District of Georgia.

8    And for that reason, we believe that the Court has

9 broad discretion under Section 329(b) to disallow and require

10 the return of excessive fees here because the fees charged to

11 the debtors were not properly or accurately disclosed.  And

12 because most of the legal services that Debtors received were

13 performed by RLG staff that did not appear to be licensed in

14 Georgia, the Court should order RLG and Ms. Sheppard to return

15 the fees paid by the debtors.

16    Next, we have debt relief agency provisions.  These

17 are found in Section 528.  Section -- the debt relief agency

18 must execute a written contract with the assisted person and

19 provide the assisted person with a copy of the fully executed

20 and completed contract.  Where this requirement is not

21 satisfied, the contract is void and unenforceable.  This is

22 found at Section 528(a)(2) and Section 526(c)(1).

23    Here, the electronic signature on behalf of RLG

24 appeared only as "Nicholas" and is, therefore, incomplete.

25 That's the signature that appeared on behalf of RLG.  Moreover,

74

1      the retainer agreement lacks the electronic signature of

2      Rodney Gibson, one of the codebtors in this joint case.  For

3      the foregoing reasons, the contract is not fully executed and

4      should be deemed void.

5             In addition, a debt relief agency must provide a copy

6      of the contract to the assisted person.  The contract must

7      clearly explain the services such agency will provide to such

8      assisted person and the fees or charges for such services and

9      the terms of the payment.  Here, the retainer agreement is

10     3 pages long, and Ms. Mulcahy's involvement or that of any

11     other attorneys not licensed in Georgia is conspicuously

12     absent.

13            Details related to the arrangement with Ms. Sheppard

14     are also left out, as is any mention of Sheppard Legal

15     Services, LLC.  Ms. Sheppard's actual involvement was limited

16     and did not include all of the services that were mentioned

17     in the retainer agreement or that were disclosed as being

18     informative by Ms. Sheppard in the disclosure of compensation

19     form even though Ms. Sheppard, not RLG, is the attorney of

20     record in the case.

21            And the point that we're making here is that those

22     services, the pre- -- the majority of the pre-petition

23     counseling and petition preparation were performed by RLG.

24     They did the work.  They get the lion's share of the fee.  And

25     then, at the last minute, the local attorney comes in to file

the case under a local ECF case filing privileges.  That's why

she receives $300 per Chapter 7 case and RLG receives 1,200,

which is 80 percent of the total attorney's fees in the case.

In addition, there are other interests that arise

under this business model, again, under Section 105, 504, and

even potentially the unauthorized practice of the law with

regard to RLG staff and attorneys who are preparing bankruptcy

petitions and advising clients here in the Southern District of

Georgia about their rights and responsibilities under Georgia

law without being licensed to practice in the state of Georgia

or admitted to practice in the Southern District of Georgia.

RLG prepares the first draft of all petitions,

schedules, including the schedule of exemptions, and we believe

that constitutes the practice of law.  In a Chapter 7

bankruptcy case, that is the lion's share of the attorney work

that goes into filing a case: pre-petition counseling,

pre-petition preparation of documents for filing so that a

bankruptcy case can be filed complete with all the petition,

schedules, and related pleadings that must be filed in order to

complete a filing and get a case to the point of discharge in

Chapter 7.

RLG has engaged in a business model under which the

services provided are split between two firms.  In this case,

the split is between R- -- Recovery Law Group and Sheppard

Legal Services, LLC, but only one retainer agreement is given

1    to the debtors.  And based on the documents that are filed with

2    the Court, which the U.S. Trustee has the obligation to review,

3    it was not apparent to us that there was any relationship

4    between Recovery Law Group and Sheppard Legal Services based on

5    the disclosures that were filed.

6         Under the model that we've discussed today, staff at

7    RLG are not licensed to practice in Georgia or admitted in the

8    Southern District to provide a substantial proportion of the

9    pre-petition services and counseling, but -- and I anticipate

10   that RLG would likely argue that this practice is legitimate

11   because a local contract attorney is paid a nominal fee to file

12   the petition and appear at the meeting of creditors.

13        Under similar circumstances, at least one other court

14   has found that this business model violates Section 504(a) by

15   engaging in prohibited fee sharing and also constitutes the

16   unauthorized practice of the law by people outside the state

17   of Georgia not licensed to be here but, nevertheless, preparing

18   petitions and schedules for filing here in our state.

19        The case I'm referencing is *In re Deighan Law, LLC,*

20   which is 637 Bankruptcy Reporter 888.

21             THE COURT:  Is this in your motion?

22             MR. PASCHKE:  Yes, it is.

23             THE COURT:  Okay.  Thank you.

24             MR. PASCHKE:  And it's at -- it's a bankruptcy court

25   decision from the Middle District of Alabama from 2022, so it's

1    a fairly recent decision.

2           And for all the reasons that we've stated in our

3    motion, Your Honor, we would ask that the attorney's fees that

4    the debtors paid in this case be forfeited as a sanction for

5    the various rules violations and statutory violations that we

6    have pointed out in our motion.

7           Thank you, Your Honor.

8           THE COURT:  All right.  Ms. Sheppard, do you wish to

9    be heard?

10          MS. SHEPPARD:  Thank you, Your Honor.  I respectfully

11   disagree with Mr. Paschke's depiction that I did not perform

12   the duties that were outlined in the retainer agreement.  So

13   while Recovery did collect documents and somebody -- I don't

14   know who.  I can't say who did what.  But someone put together

15   the initial petition and schedules.  I sat down with my

16   clients, and I went back over that line by line, step by step

17   to ensure the accuracy of that information.  Trust but verify.

18          The Gibsons -- like I said, we went over all of that

19   information, so -- and prior to me even meeting with them, I

20   had an opportunity to review their bank statements.  I had an

21   opportunity to review those tax returns so that, when I met

22   with them, if I had any questions or concerns, I could discuss

23   that with them and work through that process.

24          You heard testi- --

25          THE COURT:  How did you have access to those

1    documents?

2          MS. SHEPPARD:  They were forwarded to me.

3          THE COURT:  By RLG?

4          MS. SHEPPARD:  Yes, sir.

5          THE COURT:  Okay.  Thank you.

6          MS. SHEPPARD:  Yeah.  Everything was sent to me

7    electronically.

8          THE COURT:  At each step along the way or just at the

9    very end?

10          MS. SHEPPARD:  Just at the very end.

11          THE COURT:  Okay.

12          MS. SHEPPARD:  But once I received -- that's why

13    it would take me about 48 hours to reach out to the clients

14    to schedule the consultation, because I would review those

15    documents prior to reaching out to them.

16          THE COURT:  Understood.

17          MS. SHEPPARD:  You know, like I said, there were all

18    kinds of things that we did.  We looked at the valuation of the

19    vehicle, you know.  That was something that was really creating

20    an issue for the Gibsons in their budget because that car

21    payment was almost $900 a month.  We looked at what it was

22    worth.  We looked at what they were paying for it.

23          And people get real attached to their stuff

24    sometimes, and it's my job to say to them, "You're in a

25    bankruptcy.  You can't afford this.  And you might like your

1    car.  You might even love your car.  But if your goal is to

2    have a fresh start, you've got to let it go."

3            So, like I said, I did all of those things with them.

4    I was there with them at the 341 creditors' meeting.  If they

5    had questions or concerns in between that time, they were able

6    to contact me.  But I firmly believe that I provided the

7    services that were outlined in the retainer agreement.

8            And while it was not my personal retainer

9    agreement -- it was Recovery's retainer agreement because I was

10   working for Recovery -- I'm still having a hard time trying to

11   understand the description of fee sharing because I don't know

12   how I could share fees with my employer.

13           The fee was not negotiable.  I couldn't go to

14   Recovery and say, "You know what?  This $300, this is chump

15   change.  I need you to pay me $600 per bankruptcy filing."

16   That wasn't the -- that was not the terms of our agreement.

17           You have -- and, Your Honor, you have our agreement

18   in front of you, so you can see very clearly what it says.  It

19   was nonnegotiable.  So I'm trying to understand:  How is it

20   that I can share fees with someone who employs me?

21           And, again, as I testified, I can understand the

22   confusion with the signature block because Recovery is not

23   notated in the signature block, but I think I explained to the

24   Court that that -- the signature block is set the way that it

25   is because it's my firm's Best Case software and it's my

1   personal ECF that the cases were being filed up under.

2           But at the end of the day, I believe that I provided

3   the services that were required up under the terms of the

4   contract.  I probably did a little bit more than what was

5   actually asked for up under the terms of the contract.  The

6   Gibsons were able to get the relief that they were seeking, and

7   they were satisfied with the services.

8           So I -- I stand here today in opposition to the

9   relief that the U.S. Trustee is requesting as far as the

10  disgorgement of the attorney's fees.  And that's all I have,

11  Your Honor.  Thank you for listening.

12          THE COURT:  Thank you, Ms. Sheppard.

13          MR. PASCHKE:  Your Honor, just one final comment.

14          THE COURT:  Yes.

15          MR. PASCHKE:  Thank you.

16          I just wanted to address quickly the issue regarding

17  the contract of employment between Ms. Sheppard and Recovery

18  Law Group.  This has come up in other cases, and other courts

19  have found that these are essentially sham contracts where

20  local contract attorneys are hired on a piecemeal job-by-job

21  basis.  They're not full members of any firm, and they have

22  no responsibilities towards the firm.  They are simply local

23  contract attorneys.

24          And for that reason, other courts have found -- and

25  I listed the Deighan Law case in my brief -- have rejected this

1   argument that -- because there's an employment contract that is

2   specifically drafted to avoid the reach of Section 504's

3   prohibition against fee sharing, that that somehow renders this

4   legitimate.  It's not.  504 prohibits fee sharing.  These

5   contracts are designed to circumvent Section 504, and I don't

6   think the Court should (indiscernible) that.

7         Thank you, Your Honor.

8         THE COURT:  Mr. Paschke, while I have you at the

9   podium, let me ask you a few things.

10         First of all, do you think it's -- you've been unable

11   to communicate with RLG?

12         MR. PASCHKE:  I have received no response to my

13   motion, Your Honor.

14         THE COURT:  All right.  And are -- is -- to your

15   knowledge, is RLG involved in any other court proceeding in the

16   Southern District that --

17         MR. PASCHKE:  Not to my knowledge currently.  I

18   think, to the extent that they have a presence in Georgia, it's

19   probably more in the Northern District because I know that

20   there -- much more cases get filed up there.  So it's only

21   occasionally that one might find its way down here.

22         THE COURT:  Okay.  So I hear what you're saying about

23   Ms. Sheppard's conduct and activities.  I think, in some ways,

24   she was victimized by this outfit to some extent.  And I'm more

25   concerned about preventing them -- and so I'd be interested in

82

1    what sanctions that you think the Court could impose that would

2    prevent them from ever hiring another contract lawyer.

3            MR. PASCHKE:  Well --

4            THE COURT:  I don't know -- I don't know how far my

5    jurisdiction extends, but I'd like to run them out of business

6    in the Southern District of Georgia, if not the State of

7    Georgia.

8            Yes, ma'am.

9            MS. SHEPPARD:  If you will, Your Honor, I had a very

10   brief conversation with these people from Recovery.  Like I

11   said, after I terminated my agreement with them back in June, I

12   had no communication with them until after the trustee's motion

13   was filed.

14           The only reason -- and this is what was said to me.

15   The only reason that they were here in the Southern District is

16   because I was here in the Southern District.  When I left, they

17   were not happy with me -- they were not -- because I was the

18   only attorney that they had that could file in the Southern

19   District.

20           What was represented to me is that they've pulled

21   out.  They have no intentions of coming back here.  So I don't

22   know if that gives you any insight, but that's what they said

23   to me.

24           THE COURT:  Okay.  Well, I mean, the U.S. Attorney

25   may have something to say about whether they ever come back

1    here or not, and that's my next question.

2          Is this a situation where you would be inclined to

3    make a referral?

4          MR. PASCHKE:  We take an incremental approach,

5    Your Honor.  This is essentially our first shot across the bow.

6    Basically -- and I discussed this with my superior, Matt Mills,

7    the AUST.  Is -- if we can prevent them from getting paid,

8    that's the first step so that they can't profit from filing

9    cases down here.  And denying them fees is a good way to do

10   that.  And this is the first case where we've attempted to do

11   that.

12         So denying them fees is the first step.  And if they

13   still don't go away, then we'll come back with an adversary

14   proceeding seeking injunctive relief.

15         THE COURT:  All right.  That -- all right.

16   Understood.

17         All right.  Well, I'm -- I think we have a good

18   record, and the Court can take -- intends to take the matter

19   under advisement.

20         But, Ms. Sheppard, while I have an audience with you,

21   I wanted to share something with you.  So I practiced law for

22   31 years in Augusta.  And I think my gestational period as a

23   lawyer lasted probably -- I don't know -- 15 years.  It took

24   me a long time to really understand a lot about the practice of

25   law.

84

1          It wasn't -- it wasn't that I was stupid, although

2     some people might disagree with that.  It's just that it's a

3     complicated way to make a living and a profession to pursue.

4     And what makes it very difficult is when someone practices

5     without the benefit of other lawyers around them.  Everything I

6     learned about practicing law didn't come from a book.  It came

7     from the lawyers who hired me.  I worked in a very small law

8     firm, but I learned by their example.

9          And so when I heard you describe, you know, that, you

10    have, an office but not a staff, it made me a little concerned

11    about the extents to which you are isolated in your law

12    practice.  And I'm not being critical.  I just -- I want to

13    encourage you, as -- from one lawyer to another, to become

14    active in every bar association that you can think of, to find

15    mentors.  I mean, you're a young lawyer, by any standard,

16    and -- because I don't want to -- I don't want to -- I think

17    you got taken in by these people, and -- and I don't want to,

18    you know, see it have a negative impact on your career.

19          But it's important to recognize that you just need to

20    stay in touch with other lawyers.  You need to spend a lot of

21    time in court.  And you need to know what you don't know.  And

22    I'm -- I -- I'm convinced that you don't know Rule 2016 as well

23    as you should or the case law that talks about it.  So you

24    might want to research that.

25               MS. SHEPPARD:  Yes, Your Honor.

85

1          THE COURT:  Not to alarm you, but there's a criminal

2     code section -- well, first of all, in the bankruptcy code,

3     11 USC 504 --

4          MR. PASCHKE:  That's the fee sharing one.

5          THE COURT:  Right.  504 prohibits fee sharing.

6     Right?  And it sort of -- it has some features that are similar

7     to the issues raised in 329 and 2016, but it goes beyond that.

8     It covers a little more sinister activity.

9          But there's a criminal code section that arguably

10    might be in play in this case.  It's Title 18, Section 155.

11    And I don't have any reason to expect, you know, this is going

12    to happen, but it could.  A prosecutor with nothing better to

13    do could look at this transaction and decide that it violated

14    that criminal statute.  Then you wouldn't be practicing law at

15    all ever.

16          So I just want to caution you to, you know, be as

17    diligent as you can in educating yourself about every aspect

18    of areas that you intend to practice in.  I was always very

19    careful to have a very narrow lane because -- you know, I did

20    divorce work and a little criminal defense, and I was a

21    Chapter 7 trustee, and I knew that, you know, the farther

22    afield I went, the more danger I was in.  And it's because the

23    law is so complicated.  So I just --

24          MS. SHEPPARD:  Yes, Your Honor.

25          THE COURT:  -- want -- I just want to encourage you

1    to, you know, have a mentor, be careful, be thoughtful.

2            I'll tell you another thing that -- that -- when I

3    first started practicing law, we had what were known as advance

4    sheets.  And every week, you'd get a small, you know, 10- or

5    15-page -- and it was just a list of recent appellate decisions

6    by the Georgia Court of Appeals and the Georgia Supreme Court.

7            And then about once a month, you'd get a softbound

8    copy that was -- that was the same material, but they would

9    collect it.  And the lawyers that hired me, they told me, "You

10   must read advance sheets all the time, criminal and civil.  We

11   don't care if it's a case you're interested in or not.  Read

12   them all."  And they were summaries of the decisions.

13           But the ones that stuck out to me all the years that

14   I read them were all of the disciplinary proceedings by the

15   Supreme Court of Georgia.  You know, when they disbar or

16   suspend a lawyer, they -- they recite the history of the case.

17           And oftentimes, I would read the decision and say,

18   "Gosh, I came dangerously close to that," because it might be

19   something like, you know, they suspend a lawyer because they

20   didn't return phone calls fast enough.  Well, I wasn't -- I

21   wasn't the best about returning phone calls.  So there's lots

22   of places where you can get hung up.

23           And so I would encourage you to read disciplinary

24   reports.  It's almost like reading the Good Book because it

25   just reminds you of, you know, what's important and how to

1    stay on track.

2          I think you did -- from all I can tell, I think you

3    did a good job for Mr. and Ms. Gibson.  They seem happy.  They

4    got their discharge.  They got their fresh start that you tried

5    to help them with.

6          I share Mr. Paschke's concerns about this business

7    model.  I'm taking under advisement his motion for sanctions.

8    I'm not sure, you know, why you should be -- I may conclude it

9    later, but, as I sit here right now, I'm not sure why you

10   should be required to repay the money that somebody else got.

11   But on the other hand, if the sanction -- I don't want the

12   sanction, if any, that I might impose to be totally

13   meaningless, so I'll mull that over.

14         But, anyway, I wanted to tell you finally that I've

15   been impressed by your presence in court, your testimony, your

16   presentation, your willingness to be here and to work this out

17   with Mr. Paschke and to recognize, you know, why he's bringing

18   this action and that the U.S. Trustee has an obligation to help

19   protect the integrity of the system and the enforcement of the

20   rules.  And so I -- I'm glad that you participated willingly.

21         And I will rule on this motion as promptly as I can.

22   I'm probably going to request a transcript, Elizabeth, if you

23   can arrange that for me, so that might slow me down a little

24   bit.  But if there's nothing else, we'll stand adjourned.

25               COURT SECURITY OFFICER:  All rise.

88

1          MS. SHEPPARD:  Thank you, Your Honor.

2          MR. PASCHKE:  Thank you, Your Honor.

3          THE COURT:  Yes, sir.

4          MS. SHEPPARD:  Thank you, Your Honor.

5          (Proceedings concluded at 2:16 p.m.)

1              C E R T I F I C A T E

2

3

4       I, Victoria L. Root, Certified Court Reporter, in and for

5   the United States District Court for the Southern District of

6   Georgia, do hereby certify that the foregoing transcript of the

7   proceedings held in the above-entitled matter was transcribed

8   to the best of my ability from the Court's electronic recording

9   system and that the transcript page format is in conformance

10  with the regulations of the Judicial Conference of the United

11  States.

12       WITNESS MY HAND AND SEAL this 14th day of June, 2023.

13

14

15

16

17

18

19

20                                    _____
                                      VICTORIA L. ROOT, CCR B-1691
21                                    United States Court Reporter
                                      Southern District of Georgia
22                                    Savannah Division

23

24  Post Office Box 312
    Meldrim, Georgia  31318
25  (912) 650-4066